## TYTUS v SMITH

Ohio Appeals, 2nd Dist, Greene Co

No 418. Decided March 6, 1936

Nichols, Morrill, Wood, Marx & Ginter, Cincinnati, John P. Rogers, Hamilton, F. L. Johnson, Xenia, and C. L. Darlington, Xenia, for plaintiff in error.

Miller & Finney, Xenia, and M. E. McCallister, Xenia, for defendant in error.

## OPINION

By THE COURT

The above entitled cause is now being determined on proceedings in error from the judgment of the Court of Common Pleas of Greene County, Ohio. The parties will be referred to as they appeared in the trial court, inverse to their order here.

The real plaintiff was the minor, Ray M. Smith, but due to his minority the action was brought by his father and guardian, Joseph Smith. Ray is now past twenty-one.

The plaintiff's action was for personal injuries claimed to have been sustained while riding in an automobile as a guest with his friend Norman Clark, and alleged to have been caused by the negligence of the defendant, John Tytus, in operating his automobile on the wrong side of the road in violation of §6310-17 GC.

Plaintiff's petition was filed July 26, 1934, answer thereto on September 15, 1934, and reply October 10, 1934. Trial commenced April 18, 1935, just eleven months to the day after the accident. The jury was impanelled on the first day of trial and several days were consumed in taking evidence. On April 22 one of the jurors was taken sick. After conferences it was finally agreed by counsel that the jury might be discharged and the cause submitted to the trial court. On June 7, 1935, the court released a written opinion, finding in favor of the plaintiff. Defendant interposed motion for separate finding of facts and conclusions of law. This motion was sustained and separate findings made by the trial court. Motion for new trial was filed and overruled. On July 16, 1935 judgment was entered for plaintiff in the sum of $18,850.00. This is the final order from which error is prosecuted in our court. The motion for new trial and also the petition in error sets forth nine specifications of error, but in the oral argument and briefs counsel for plaintiff in error urge but two grounds, as follows:

"1. The verdict is manifestly against the weight of the evidence.

"2. The amount of the verdict is excessive."

While other grounds of error are not specifically withdrawn from consideration, we assume that since same are not presented in argument or brief no reliance is placed thereon at this time. In addition, we might say that we find no prejudicial error on any of the grounds not presented in brief.

Both grounds of error urged by counsel for plaintiff in error involve the question of the weight of the evidence and this necessitates a very careful and thorough examination of the evidence as presented in the record.

The accident occurred on the morning of May 18, 1934, between the hours of 1:30 and 2:00 A. M. and on U. S. Route No. 42, between Xenia, Ohio and Spring Valley, Ohio, about four miles south of Xenia. At this point U. S. Route No. 42 is hard-surfaced, a thoroughfare about 19 feet in width and with gravelled, usable berms on either side of about four feet, making the usable portion of the road about 27 feet in width.

The defendant, John Tytus, resides in Middletown, Ohio, and is Vice-President of The American Rolling Mills Company in that city. He is fifty-nine years of age. During the day he had driven to Columbus, Ohio, to see his dentist. Accompanying him on the trip over and back was Mrs. Allen Andrews, Jr., of Hamilton, Ohio. The uncontroverted evidence is that at the time of and immediately before the accident he was driving his Ford coupe at a speed not exceeding 35 miles per hour. The car in which the plaintiff, Ray M. Smith, was riding, and operated by Norman Clark, was a Tudor Ford Sedan, and before the accident, according to the testimony of Clark, was operated at a speed of about 45 miles per hour.

During the early evening and until midnight the plaintiff Smith, Clark and another young man by the name of Crites, and three girls had spent the time in and

around Dayton, Ohio, visiting at three different dance halls. They left Dayton after the dance halls closed, returned to Xenia, where the young ladies were taken to their respective homes, and Crites to where his own car was parked in the business section of Xenia. Clark was taking the plaintiff, Smith, to his home in Spring Valley when the accident happened.

There is evidence that the three boys and three girls, when they left Xenia for Dayton, had with them a half pint of gin, which was consumed after they arrived at Dayton. They also drank some beer in each of the three dance halls. This evidence is only important as it might reflect on the question of Clark's ability to drive his car. Aside from this evidence given by Clark and Smith as to the quantity, time and place of drinking liquor, there is no evidence supporting intoxication.

There are also some kindred aspersions as to the defendant, Tytus, a married man, being out at this late hour with a married woman. Counsel for defendant sought to meet any possible claim against propriety by having present and calling as a witness, Allen Andrews, Jr., the husband of Mrs. Josephine Andrews, the lady who was with Mr. Tytus in the car. Of course, this incident really has no bearing upon the question of negligence or responsibility for the accident and resultant injuries. The only eye witnesses who were able to give any direct testimony of pertinent facts immediately before and at the time of the accident were Clark, on behalf of the plaintiff, and Mr. Tytus, on his own behalf.

The plaintiff Smith says that he has no recollection of anything after leaving Xenia and striking Route 42 on the way home. He does not know whether he was asleep or whether the accident erased his memory of immediately preceding events. Medical testimony is offered that severe accidents sometimes have that result. Clark says that as they were approaching what proved to be the Tytus car Smith spoke to him about it.

Mrs. Andrews says that, while not asleep, she was riding with her eyes closed and hence knew nothing until she heard the screeching of brakes immediately before the crash. The defendant, Tytus, says he saw the approach of what proved to be the Clark car by reason of reflection in his windshield, and that it had the appearance of coming fast. At that time he pulled to the extreme right and was so driving when the Clark car hit his car in the rear. Clark thinks he first observed the tail light of the Tytus car when he was 300 or 400 feet away, and at that time it was in the center of the road; that when something like 150 feet away he sounded his horn the first time and the Tytus car apparently responded to his signal by pulling towards the right; that thereafter he observed it again pulling towards the right; that thereafter he observed it again pulling towards the center, and at something like 75 feet away he gave a second signal, but the car proceded towards the center. He gave a third signal and at the same time applied his brakes when he arrived at the conclusion that he could not pass the car, either to the right or left. Tytus claims that he heard no signals by horn. Plaintiff says that Clark did manage to get the front of his car past on the left side of the road, but the rear of the Tytus car struck his car on the rear right side, mashing the running board, fender and rear side panel. Tytus denies that he at any time after seeing the reflected lights in his windshield was driving his car on the left or wrong side of the road, but says, on the contrary, that he was driving well over to the right. The Tytus car was very badly damaged and in a general way as follows: The spare tire on center rear of the car, and tire carrier broken; the rear bumper, rear glass, rear panel on left side dented, a hole knocked in the gasoline tank and the same crumpled in, all near the left end. The left rear fender mashed, the frame bent, the left rear wheel mashed and thrown up against the body, so that it would not revolve. In other words, the physical conditions disclosed the force of the impact upon the Tytus car to be at the left rear, extending to the rear center.

Very generally in rear end collisions the front of the car following comes in contact with the rear of the car in front. The location of the injuries and damage to the Tytus car would lead to this conclusion in the first instance, but when we find by undisputed evidence that the front of the Clark car was not damaged, we must look for further physical facts, if disclosed.

Both sides, in order, present witnesses who visited the scene of the accident shortly following the hour of its occurrence and before daybreak. The first person present, following the crash, was Mr. Roy Hinshaw, bookkeeper for The Eavey Company, and residing at 18 Union Street, Xenia. He was driving his automobile on this Route 42 towards Xenia and was within a few hundred feet of it when it happened. He

gives no evidence of having heard the crash, but he did see the oncoming lights and they then rather suddenly dashed to the side ditch. When he arrived he gave his immediate attention to helping Clark find Smith, the latter having been thrown out of the car. He was found under the front end of the Clark car. With some difficulty he was extricated, placed in the Hinshaw car and, together with Clark, taken directly to the hospital in Xenia. Before leaving the scene of the accident, a truck came along, also going towards Xenia, and Hinshaw requested them to look after the passengers in the other car. The two cars were in the ditch on opposite sides of the road, the Tytus car being on the right side and the Clark car on the left side. After delivering the Smith boy at the hospital and waiting a short time, Hinshaw and Clark returned to the scene of the accident and there made some investigation. He describes in a general way the injuries to the two cars that he observed. There seems to be little conflict in the testimony on the question of location of injuries to the cars. It might be mentioned at this time, since we did not so state previously, that there was no injury to the tires or wheels of the Clark car, except the front hub and spindle.

Mr. Hinshaw testifies that he examined the roadway and could see gasoline spilled on the road. It was located a little east of the center of the road, which would be the left side as the cars involved in the accident were proceeding. He says that this gasoline mark proceeded across the road in the direction of the Tytus car on the right hand side. He makes no reference to tire marks in the road.

Norman Clark also examined the road while he was with witness Hinshaw. In his testimony he refers to a mark on the roadway as if the tires had made a line, but does not say where in the road. He also refers to the gasoline mark, which he says was well to the left side of the center of the road as you were going towards Spring Valley, and that this trail of gasoline led to the Tytus car.

M. C. Smith, city manager of Xenia, Ohio, and an uncle of the injured boy, was telephoned to from the hospital and requested to go out and bring in the father, Joseph Smith. He first went to the hospital and from there drove out to Spring Valley, where the father lives. His direct route was out Route 42 and past the scene of the accident. On his way out he made a casual observation of the location of the two cars. The Tytus car was in the ditch on the right side of the road, and the Clark car in the ditch on the left side of the road, so expressed considering the direction in which they were going previous to the accident. The two cars were almost opposite each other.

Mr. Smith proceeded to the home of his brother, Joseph Smith, and then immediately returned with him to the hospital. After spending a reasonable time at the hospital, Messrs. M. C. Smith and Joseph Smith returned to the scene of the accident and there made a more thorough investigation of the physical conditions. At the time of their arrival John Baughn, sheriff of Greene County, and his deputy, J. B. Newsome, were present, also making an investigation of the physical conditions. Each and all give testimony as to the damaged condition of the cars, some in more detail than others, but nothing in conflict with the general condition heretofore referred to. Joseph Smith says that at the time of their arrival the Clark car had been removed. Mr. M. C. Smith described in detail tire marks on the highway, which he says were clearly traceable to the Tytus car.

In order to avoid confusion we will refer to the right and left sides of the road as the cars were moving before the accident, rather than to cardinal directions. We might also say that before the accident the two cars were proceeding in a general southerly direction, and therefore the west side of the road would be the right and the east side of the road would be the left. Mr. M. C. Smith in his testimony traces this tire mark both ways; that is, he describes it as he traced it from the Tytus car as it was located on the right side of the road in the ditch up over the berm, the four foot gravelled strip, the hard surfaced road to the center, and then for a distance of approximately 30 feet, about 3 feet on the left side of the center and then again crossing to the center and proceeding in a diagonal direction, about 100 feet to the berm. He also repeats his testimony in the same answer by starting at the berm and proceeding on the right side practically 100 feet to the center, then across the center, about 3 feet, and for a distance of about 30 feet on the left side of the center, then back across the center and over the hard surface, gravel and berm to the Tytus car. He also gives evidence of a large puddle of gasoline about four feet from the center, on the left side of the road, directly opposite the point where the moving Tytus

car crossed the center from the right side to the left side.

For a better understanding of the subsequent narrative we might say at this point that the trial court was of the conclusion that the evidence warranted the inference that the collision took place at this point.

Mr. Smth described this tire mark as a well-defined continuous line on the right side, for approximately 100 feet, up to the center of the road, directly opposite this puddle of gasoline. This tire mark in the road was made by the left rear wheel of the Tytus car and there is clear evidence that the wheel was not revolving. Mr. M. C. Smith also was present eight days later, when photographs were taken of the tire marks and gasoline marks, and further states that these photographs correctly represent the marks in the road, just as he saw them on the early morning following the accident. This removes ▆▆▆▆▆ any question that might otherwise arise as to remoteness.

Joseph Smith also testifies in a general way to the tire and gasoline marks, although not in such full detail, nor with such definiteness as does his brother, M. C. Smith. Both testify to marks on the left hand surfaced portion of the road, intended to support the theory of tire skid marks of the Clark car. These appear at regular intervals and about 24 inches in length, but were not discernible between the location of the gasoline puddle and the location of the Clark car in the ditch. These possible skid marks were not definitely located as to their distance from the center of the highway, but were said to be on the left side of the road. Four photographs were presented in evidence, all taken by the same photographer, eight days after the accident. Three were presented, identified and introduced in evidence by the plaintiff. The fourth was in the possession of counsel for the plaintiff, and on request was delivered to counsel for defendant and the latter then introduced this fourth photograph in evidence as Defendant's Exhibit 2. These photographs, and particularly Defendant's Exhibit 2, will be referred to later.

No other or further testimony was presented by plaintiff relative to tire marks or gasoline marks on the highway.

Counsel for defendant presented two witnesses, who examined the general physical conditions on the early morning immediately following the accident. One was John Baughn, sheriff of Greene County, and the other, J. B. Newsome, his deputy. These men were called to the hospital following the accident and from there went out to the scene of the accident before daybreak and were there at the time of the arrival of Mr. M. C. Smith and his brother, Joseph Smith. The testimony of each as to the damage to the respective cars conforms to the other testimony in a general way, although probably none gives as full and detailed a list of injured parts as does the mechanics examining the cars or looking over same for the purpose of estimating damages. Both these witnesses testify that they were able to trace the tracks of the Tytus car on the right side of the highway and that at no time did the Tytus car cross the center onto the left side. These tracks were traced back a distance of from 75 to 100 feet. The tracks of the Tytus car showed that it was pulling towards the center. There were other tire marks across the center on the left side at or near the point where the sheriff thinks the collision occurred. Neither the sheriff nor his deputy observed any gasoline or gasoline marks on the highway.

We now come to examine the photographs introduced in evidence as exhibits. Plaintiff's Exhibit A and Defendant's Exhibit 2 are interesting and helpful. According to the photographer, Plaintiff's Exhibit A was taken for the purpose of showing the gasoline stains, but it does, in a measure, show some of the same physical conditions as shown in Defendant's Exhibit 2. However, the latter was taken for the purpose of showing tracks and is clearer and more distinct as to tire marks. The photograph of this tire track necessarily presents a more correct idea of its location and course than could possibly be done by witnesses relying upon their recollection. Of course, we always have the question whether, through photographs or testimony of witnesses presenting physical conditions following an accident, such condition had a causal connection with the subject being investigated. Applying th's idea to the instant case the query arises as to whether or not the evidence sufficiently identifies the tire mark shown in the highway as having been made by either one of the cars involved in the accident. We have present such an identification in the testimony of Mr. M. C. Smith, who identifies the lines and says they are the same as he observed on the early morning after the accident, and that they were traceable in a connected line to the Tytus

car. This testimony will be found at pages 168, 172, 173 and 174 of the record.

This single well-marked, well-defined line, as presented in the photograph, Defendant's Exhibit 2, coupled with the oral testimony of various witnesses who visited the scene of the accident does, we think, present the correct evidence as to the location of the Tytus car on the right side of the road, at least up to the center line. There is no controversy in the evidence that the wheel mark which clearly shows on the right side of the hard surfaced pavement is made from a non-revolving wheel. The facts that it remains and shows so clearly eight days after the accident urges very strongly that it is more than a clamped wheel from use of brake. There is no conflict in the evidence that this wheel mark, something like 75 to 100 feet in length, on the right side of the road, was made by the left wheel of the Tytus car. It must be kept in mind that it was the left wheel of the Tytus car that was so wedged into the frame that it would not revolve. To our mind it is more inferable than otherwise that the collision and mashing and wedging of the rear tire of the Tytus car so that it would not revolve occurred where this tire mark starts, well over to the right on the right hand side of the road. The only reason assigned for fixing the point of collision at a different location, as we understand, is the puddle of gasoline. We cannot see why this should be controlling. A car moving at a speed of 45 miles per hour will travel 66 feet per second. In our judgment it is easier to explain the failure to find signs of gasoline along this 75 to 100 foot wheel mark than to conclude that the wheel mark was made otherwise than by the collapsed non-revolving wheel. While it is true there is no evidence by any of the occupants of the two cars of more than one crash, still there is no evidence to the contrary. This could easily occur and be in such quick succession that the occupants of the cars, in the excitement, could not discern it. It is passing strange that if the Clark car, moving at a speed of 45 miles an hour, and coming in contact with the Tytus car, moving at a speed of 35 miles an hour, and of such character as to cause major damage to each car, would not make many gyrations on the road and come in contact more than once and all this in a period of not more than two or three seconds.

It is impossible to determine just at what point or in what manner the gasoline tank of the Tytus car was slit so as to permit the gasoline to escape. If we accept the theory that the crash occurred at or near the point where the Tytus car approached the center line on the highway and that the wheel marks on the left of that center line were made by the left wheel of the Tytus car, we are then forced to the conclusion that the contact did not take place on the left side of the road. It is self evident that the narrow line extending from the white center over to the left was not made by a car moving on its own power. It would be absolutely impossible for a wheel to move in that direction, except by skidding or being knocked over. If the collision occurred at or near this point, the conclusion is irresistible that the Clark car struck the Tytus car on the right side of the white line and pulled it over on the left side.

It is our judgment that the physical evidence does not support the contention of the plaintiff that the defendant, Tytus, was operating his car on the left side of the road. We have heretofore stated that the only eye witness giving any testimony of conditions immediately preceding and at the time of the accident were the driver Clark, on behalf of the plaintiff, and defendant Tytus, on behalf of himself. According to Clark the Tytus car immediately before the accident was pulling over towards the center of the road, and he reasons that at the time of the crash he was across the center. On the other hand, Tytus says that he was well over on the right side of the road. If we accept the theory that the crash occurred at the point where the wheel mark starts, then the physical evidence supports Tytus. If, on the other hand, the view is accepted that the crash occurred at the other end of the tire mark, near where it approached the white center line, then the physical evidence corroborates Clark to the extent that Tytus was driving his car towards the center, but would not support Clark in his reasoning that the Tytus car was being driven on the left side of the road. It will be observed that Clark does not say positively that the Tytus car was being driven on the left hand side of the road. (See pages 33, 34 and 35 of the record) That Clark so reasons that the Tytus car was being driven on the left hand side of the road is unquestionably true and it clearly appears that his answer is based upon his deductions. The first reference to this question is at the bottom of page 34 and top of page 35, and in his answer

to the following question, propounded by counsel for plaintiff:

"Q. With reference to this center line, at the time the cars came together, where was the Tytus car?

A. I was watching the car more than anything else, but from the position I last seen it and his gradual pulling to the left, I would say practically the whole car was past the center line.

Q. On which side of the road?

A. On the left side of the road.

Q. In the direction you were going?

A. Yes."

Also see the following question and answer in the middle of page 34:

"Q. Then what happened?

A. Then, I seen that he was not going to lay over to the right, so there was a moment of indecision in my mind as to what to do, whether I could possibly pass on the right or not, and I decided against that. By that time I seen my brakes were not going to stop me in time to avoid a collision, so I attempted to get in the ditch. In doing so, the front end cleared his, and my right rear struck his left rear."

If Clark was over on the left side, where he should be in attempting to pass, why should there be indecision as to the possibility of passing on the right side at a time when he knew that his brakes were not going to stop him in time to avoid a collision?

Furthermore, the evidence discloses conclusively that this road is very wide, to-wit, the hard surfaced portion 19 feet and the gravelled usable berms an additional 4 feet wide on each side, making the usable portion of the road 13½ feet in width to the right and left of the white line. Even if Clark's deductions were correct that the Tytus car was over on the left hand side there would still be 8½ feet to the left of usable road upon which to pass.

What reason can be given for Tytus, driving his car from the extreme right diagonally across the road to the center and then over the center, if he knew a car was approaching from the rear and that it desired to pass? Tytus says that he knew of the approach of the car by its reflection in his windshield, and at that time moved over to the right. He did not hear any signal by horn, and hence, if this be true, it cannot be claimed that he gave heed to a horn that he did not hear. ▮▮▮▮ Failure to observe a signal by horn will not constitute

negligence unless the horn is heard. It is just unthinkable that Tytus would pull over to the extreme right to permit a car to pass and then immediately thereafter drive clear over on the left hand side of the road.

We now call attention to the cross examination of Mr. Clark at pages 55, 56 and 57, relative to the movement of the Tytus car. On page 55 he testified that when he blew his horn the second time the left wheels of the Tytus car were approaching the center line of the road, and then the following questions and answers:

"Q. Did you blow your horn a third time?

A. Yes.

Q. How far were you from the defendant's car when you blew your horn the third time?

A. I don't know. I was very close.

Q. Was it far enough away so that at that time you could have, by applying your brakes, stopped your car before striking his car?

A. No."

Then follow questions and answers as to applying the brakes, distance, and so forth, and then at the center of page 56 the following:

"Q. Inasmuch as you could have stopped the car within forty feet, therefore, you must have been closer than forty feet when you blew the horn the third time?

A. Yes.

Q. Now, after you blew the horn the third time, when you were some place within forty feet, you don't know how many feet, but so close that you could not then, by applying the brakes stop, what was the position of the defendant's car then with reference to the center line of the road? Was he pulling still further over to the left of the road?

A. Yes.

Q. So that, as I understand it, at the time of the collision, his car was completely to the left of the center line of the road?

A. I couldn't say that for sure.

Q. Well, you can't say that for sure, but is that your best judgment?

A. That's my best judgment.

Q. Your best judgment is that even the right wheels, front and rear, of his car were to the left of the center line of the road?

A. Yes."

We now repeat what we have heretofore stated, and that is that Tytus and Clark were the only eye witnesses giving testimony. The plaintiff, Smith, who was in the Clark car, knows nothing about the accident, and Mrs. Andrews, who was in the Tytus car, was riding with her eyes closed, and her first intimation of the impending danger was the screeching of brakes and the crash immediately following. It is a matter of common knowledge that after you open your eyes, particularly in the night season, it takes a few seconds to adjust them, so that you can see the surrounding situation. Of course, in these few seconds the accident would be over and the cars at a standstill in the ditch.

If we reconsider the case on the question of the weight of the testimony, it is proper to search the record for any and all testimony that touches the credibility of the witnesses. Giving application to this rule with respect to the defendant Tytus and the witness Clark, heretofore referred to as the only two eye witnesses, we find that Mr. Tytus is a man fifty-nine years of age, residing in Middletown, Ohio, and is Vice-President of The American Rolling Mills Company in that city. We find nothing in the record reflecting on his credibility as a witness.

As to Clark, it is disclosed that a short time after this accident he was arrested for grand theft in California, entered a plea of guilty and was sentenced. Specifically, the offense was stealing an automobile. He also admits that at times he had gone under an assumed name. The sheriff testifies that on the morning immediately following the accident he talked with Clark about the accident, and he then stated to him that he did not know who was to blame. Clark, on being interrogated as to this conversation, says that he does not believe that he made such a statement, but on further inquiry, said that he would not deny it. It is in evidence that Clark was seeking frequent interviews with Tytus, and saw him no less than ten times. Clark admits four or five times, and possibly more. Tytus and other witnesses present at some of the interviews say that he was unable to ascertain definitely what Clark wanted, but, from certain statements made felt that he was threatening to blackmail him. Clark denies this and says that he felt that Tytus owed him something but failed to give any clear statement of his demands. It is also claimed that in some of these interviews Clark stated that he

was in need of money because he had issued a bad check. Clark says he does not remember making the statement, but admits that he may have done so.

There is also admitted in evidence Defendant's Exhibit 1-a and 1-b, Exhibit 1-b being an envelope addressed to John Tytus. The envelope was one from the Hotel Manchester, Middletown, Ohio. The letter, Exhibit 1-a, was written on a letterhead of the Hotel Manchester, Middletown, Ohio, and was addressed to Mr. Tytus and is unsigned. Clark admits the writing but disclaims mailing. It appears on its face that it was not sent through the mails, but is claimed to have been delivered at the office for Mr. Tytus during his absence. In any event, it came into the hands of Mr. Tytus. It is unexplained by Clark and, to say the least. is suspicious.

We recognize the rule that regardless of this evidence as to the character of the two men, the trial court, who saw and heard the witnesses, has the right to accept the testimony of either. However, the testimony of Clark cannot be extended as proving beyond what he says. His reasonings and deductions are not evidence. His testimony must be confined to facts. It is the province of the jury, or the court, where a jury is waived, to make the deductions. Applying this principle we find, as heretofore quoted from Clark's direct testimony, that from the position that he last saw the car and his gradually pulling to the left he would say the Tytus car was over the center; but in the cross examination, as heretofore quoted: "I would not say that for sure, but that is my best judgment." The fact that this evidence went in without objection would not change the rule as to its probative value.

The physical evidence presented by witnesses who visited the scene of the accident and observed the tire tracks, gasoline marks and positions of the cars very positively shows that his deductions were wrong and his judgment on the position not good. Mr. M. C. Smith, an uncle of the injured boy, was the first to visit the scene of the accident, but on his first trip he did little more than examine the cars. Shortly thereafter Clark and Hinshaw returned to the scene of the accident, but they gave no detailed evidence as to the marks in the road that can aid in the slightest degree in solving the problem. The next to appear on the scene was the sheriff of Greene County, Mr. Baughn, and his dep-

uty, Mr. Newsome. They were there for the purpose of examining the physical conditions and to ascertain, if possible, the manner in which the accident occurred. Both of these men testify that they were able to trace both wheels of the Tytus car from its position 100 feet or more down the road to where it landed in the ditch, and that at no time was the Tytus car being driven on the left side of the road.

While the sheriff and his deputy were viewing the scene of the accident Mr. M. C. Smith and Mr. Joseph Smith, the latter being the father of the injured boy, visited the scene for the purpose of examining the physical conditions. Their testimony has heretofore been narrated in detail. They traced the tracks of the Tytus car from the extreme right in an angling direction towards the center for a distance of about 75 feet. They then say that the track crossed the center on to the left side and followed on the left side for a distance of about 30 feet, when it again crossed to the right side and into the ditch. Mr. M. C. Smith places this distance from the center line at about 3 feet, and his brother, Joseph Smith, at about 1½ to 2 feet. They also testify to a pool or puddle of gasoline in the road on the left hand side at about the point where the Tytus car crossed over the center line. The trial court makes the deduction from the location of this pool of gasoline, that this was the point of contact. Without any further explanation this testimony of Mr. M. C. Smith and his brother, Joseph Smith, would be substantive evidence leading to the inference that the Tytus car was over on the left hand side. Unexplained, it possibly might be inferred that it was being driven there. However, eight days following the accident they engaged a photographer to go to the scene of the accident and make photographs. Mr. M. C. Smith was present at the time same were taken. The photographer took four different views. The plaintiff only introduced three, but the fourth was produced on call of counsel for the defendant and then introduced in evidence, being identified by the photographer. The photograph shows a very clear and distinct black line on the right hand side of the road, covering a distance of what is estimated to be 75 feet, and coursing a diagonal line from the right side of the paved portion of the road to the center white line, but not across it, except in the photograph which was offered in evidence by defendant, it shows a sharp, almost right angle line across the center

and on to the left side of the road, and then on for some distance, where it again crosses to the right side and witnesses say down into the ditch where the Tytus car was standing. Exhibit A shows this black line and its abrupt crossing in the center line, but not as clearly as does Exhibit 2, introduced by defendants. The photographer taking the pictures explains that Exhibit A was not taken for the purpose of showing the tire line, but rather to show the gasoline marks. This same photographer says that Exhibit 2, which he took, was taken for the purpose of showing the tire marks. We have heard in the past of trick photography where perspective is not properly shown. It certainly would not be proper to indulge this possibility in this case, since the photograph was taken by plaintiff's photographer and when Exhibit 2 was taken it was for the purpose of showing the tire or wheel marks. His camera was on the left side of the road (considering the direction in which the cars involved in the accident were moving). Considering that the line from the center of the road moves almost at right angles across the center and on to the left side of the road, we can understand that the photograph might not show the width of the mark, but it would correctly show its direction and course. The conclusion is, therefore, irresistible that even if the point of contact between the cars was at or near this center line, the left wheel of the Tytus car did not go over on to the left side on its own power. It is physically impossible for the real wheel of a car under its own power to take the course as shown in this photograph, Defendant's Exhibit 2. From the physical facts it must be concluded that it was pulled over.

As further bearing on the identity of this wheel mark in its entire course we again refer to the testimony of Mr. M. C. Smith, who testifies that this mark shown in the photograph is the same mark that he saw on the highway in the early morning following the accident, and that at that time it was traceable directly to the Tytus car. This photograph is of much higher value than the testimony of witnesses who depend upon their recollection. However honest, we know as a matter of common knowledge that it is difficult to remember with exactness physical conditions such as existed there on the morning following the accident. Ordinarily, a photograph taken eight days following an accident would not be accepted, because it

would be too remote and because of the possibility of conditions then found being brought about by some other incident. In the instant case their value reaches the maximum because of the fact that Mr. M. C. Smith furnishes the evidence that the condition as to the wheel mark at least was identical as he saw it the morning after the accident. Mr. Smith was, of course, friendly to the cause of the plaintiff. If any part of the photograph did not correctly present the situation, he would have said so.

We now search the record as to whether or not there is any conflict in the testimony of plaintiff's witnesses from the conditions shown in the photograph marked Defendant's Exhibit 2. A most careful reading of the testimony will disclose that there is no conflict unless it be the deductions of the witness Clark. The photograph, Defendant's Exhibit 2, is explanatory of the oral testimony and not in conflict. When witnesses Joseph Smith and M. C. Smith, father and uncle of the injured boy, testify that on the morning following the accident they traced the tire mark of the Tytus car from the extreme right side of the paved portion of the road diagonally to the center line, then across the center line a distance of from 1½ to 3 feet, and then continuing down the left side for a distance of 30 feet, where it again crosses to the right side and in a ditch, the natural effect on the listener to such a statement would be that the car was moving in a regularly well defined natural course, although witnesses do not say so.

When we examine the photographs it gives an entirely different explanation to their testimony. We then for the first time find an element present that we otherwise would not think of. The witnesses have not testified untruthfully, but we have not visualized correctly. As heretofore stated, the photograph is explanatory and gives us the correct situation.

Some comment has been made relative to a statement made by Mr. Tytus at the hospital to the sheriff and his deputy. The inference is drawn that Mr. Tytus made the remark that he would take care of everything, and from this it is urged that he was recognizing his negligence and liability. We are unable to conclude that the testimony of the sheriff and his deputy on this question will bear any such construction. The officers were interested in clearing the wreckage from the highway, and not in the question of personal injury damage to the plaintiff. They were talking about the cars. Mr. Tytus did look after his car and have it removed from the highway.

It is the view of two members of this court that the finding and judgment is manifestly against the weight of the evidence and that the cause should be remanded for new trial. However, the other member of the court does not concur in this conclusion and under the law it follows that a reversal on the weight of the evidence cannot be had except where all three members of the court concur.

There will be appended to this opinion the dissent of Judge Hornbeck.

Another claimed error is that the amount of the judgment is excessive.

After we pass the question of liability we would not be inclined to disturb the amount of the verdict. By reason of the fact that only two members of the court concur in the view that the judgment should be reversed on the weight of the evidence the judgment of the lower court will be affirmed.

Exceptions will be allowed.

BODEY, J, concurs.
HORNBECK, J, dissents.

### DISSENTING OPINION

By HORNBECK, J.

The versions of the collision and the events leading up to it, given by Clark, the driver of the car in which plaintiff was riding and Tytus, the defendant, are in marked conflict. Nor, in my judgment can any reasonable interpretation be put upon Clark's testimony as a whole, which places his car at the time of the collision on his right side of the road. Clark never placed the Tytus car on the left side of the road at or near the time of the collision. His only doubt was whether all of it was on the wrong side and he said that in his judgment, based upon close observation it was. If there were no evidence in this record save the statements of the witnesses, the finding and judgment could have been for either party.

I hold no brief whatever for the witness Clark and readily concede that without other circumstances his reputation and standing, as compared with that of Mr. Tytus as it appears in this record, would clearly mark the testimony of Mr. Tytus the more credible. The majority stresses

the credibility of the Tytus testimony but refuses to accept it in three particulars. This must be said for Clark's testimony. His statements at the trial were not there made for the first time, but had been recited on other occasions and reduced to writing and every opportunity was available to the defense to mark any discrepancy or untruth that might appear by means of comparison. It therefore seems reasonable to conclude that Clark at all times had given the same version of the facts surrounding the collision. Then, too, we must assume that the trial judge had a full appreciation of his obligation to test the quality of the testimony and the credibility of the witnesses and no doubt Clark's testimony was subjected to all the scrutiny to which this court has subjected it and that it was only accepted when other testimony and the physical facts rendered it probable.

It is well at the outset to restate the obligation of this court in this case, as frequently announced in the decision of the upper courts. Courts are loath to set aside a verdict upon the weight of the evidence, as it is the policy of the law that the jury (here the trial judge so acting) shall be the ultimate arbiters of questions of fact. As early as Webb v Protection Ins. Co., 6 Oh St 456, our Supreme Court said:

"It is only where a verdict is palpably against the evidence, or the decided weight of it, that courts are warranted in interfering to set it aside, in order to send the cause to another trial. * * * It is not enough that the court is not satisfied that the verdict of the jury was right and the judgment should not be set aside unless manifestly contrary to the weight of the testimony, or clearly wrong." Cleveland & S. S. Traction Co. v Garnett, 18 O.C.C. (N.S.) 215, affirmed without opinion, 81 Oh St 483.

The cases which have peculiar application to the finding and and judgment in this cause are Reibel v Belt, 119 Oh St 369; Industrial Commission v Pora, 100 Oh St 218; City Ry. Co. v Shively, 17 Oh Ap 172, which are authority for the proposition that where the verdict is based upon one of different conflicting inferences reasonably from the evidence, it should not be set aside.

The trial judge, acting as a jury, was not required, as a jury would have been, to make a finding as between the plaintiff and the defendant immediately after the conclusion of the trial, but had opportunity to and did deliberately give marked and extended consideration to all of the testimony. The conclusion reached was the result of painstaking attention devoted to the record, as is disclosed by the written opinion, of which we have had advantage. I am constrained to say that the collision could have happened as the trial judge found that it did occur.

Determination of this case below depended upon one major question, viz.: where did the collision occur?

If upon the whole record the trial judge could find that the evidence preponderated to the effect that the cars came together on the left side of the center of the road, then he had support for the finding for the plaintiff. This is true because if Tytus was negligent, whether or not Clark sounded his horn or Tytus heard any warning or Clark chose the proper course in driving his car immediately before or at the time of the collision, or whether or not he had ample room to get around the Tytus car though he was on the wrong side of the road are inconsequential, because the negligence of Clark, unless the sole cause of the accident, is of no concern.

Nor is it controlling that Sheriff Baughn or his deputy did not see a certain mark across the center of the road, nor observe any gasoline in the road or note any trail of this gasoline to the edge of the right side of the road, and did not remember tracing tracks from the Tytus car in the ditch to the left of the center of the road. Others saw and testified to these facts and the photos tend to support their testimony. On the other hand, there is direct conflict between the sheriff and the defendant. The sheriff says that after the accident and after Mr. Tytus knew that Smith had been badly injured he (Tytus) said that everything would be taken care of. Tytus denies this statement in toto but the court may have believed the sheriff. If so, he may have been of opinion that the implication of the statement was an admission of fault.

The parties tried this case, counsel presented it and the trial judge decided it upon two well-defined theories: the plaintiff, that the collision occurred on the left side of the road in the direction in which the cars were moving; the defendant, that the accident did not so occur and the further claim that it happened well over on his right side of the road. The drivers of the cars involved were in agreement that there was but one collision.

In this court a third theory is evolved,

which is new and distinct, namely, that there were two collisions, a conclusion reached not from the statements of any of the witnesses, but from one photo. The majority believes that because of the excitement the drivers of both cars failed to note that their cars collided twice instead of once. They say there is no evidence to the contrary. I believe that much of the evidence and every reasonable inference to be drawn from the physical facts is to the contrary.

Let us look for a moment to the new theory of two collisions. Both witnesses who profess to know anything about the facts say there was but one collision. The damage to the cars lends no credence to the claim of two collisions. The eye witnesses say that the cars were moving at different speeds, the Clark car faster than the Tytus car. Unless both are mistaken, then it was impossible for the cars to have been twice in impact at places separated by more than 100 feet. If the first mark in the road, beginning at the extreme right, was made by the disabled left rear wheel of the Tytus car, as concluded by the majority, it could not move as fast as the free-moving Clark car from the point of the first collision to the place of the second collision. If there was a collision at the northern terminus of the mark on the photo. Defendant's Exhibit 2, no weight whatever can be given to the testimony of the witnesses who describe the brake marks probably made by the Clark car. There are many other reasons which completely refute the two-collision claim, a statement of which would unnecessarily prolong this opinion.

It is necessary to discuss the photograph marked Defendant's Exhibit 2 because the majority relies upon this photograph. The other photos, Plaintiff's Exhibits A, B and C, lend no aid to the defendant. On Defendant's Exhibit 2 there are to be found three distinct marks or tracks, reputed to have been made by the left rear wheel of the Tytus car. We number them for facility in reference. No. 1, the long, regular mark, more than 100 feet long, and extending in a gradual curve. from the extreme right or west side of the road up to about the center thereof. Although the witnesses fix the length of this mark at 100 feet or less, if there is any value in the photos it is nearer 200 feet long, because the surveyor fixes the distance between the telephone poles on the west side at about 204 feet and the mark extends more than the distance between two poles and does not

show the additional length to the edge of the road.

No. 2, beginning at about the center of the road is the line connected to No. 1, not quite reaching No. 3 and extending apparently almost due east over the center and to the left side of the road. This line in Plaintiff's Exhibit A appears to be but a continuation of No. 1, and No. 3, a track about 30 feet long, which is the uneven mark in which for a distance the edges are most prominent, and then but the outer edge appears throughout its length, ending well to the left of the center of the road.

Track No. 1 must have been made by a tire, probably inflated. No. 3 could not have been made by a tire. There is marked change in its appearance at the place where only the left edge appears. No. 1 seems to be wider as it approaches the south. No. 2 seems much narrower than No. 1, and the length of the lines is deceptive. All of these effects may be and probably are the result of perspective. Obviously, as line No. 1 approaches the camera it would appear larger and wider, although it may be of uniform size throughout its entire length. As mark No. 2 would bear either to the right or left this photo would fail to carry its. true dimension of width, depending upon the angle at which the turn was made. Neither the width of line No. 2 nor its characteristics appear in the exhibit. Though the trial judge did not mention it .in his opinion the majority would base a reversal of the judgment upon a conjecture as to how and when it was made.

It may be that mark No. 1 extended into No. 2 without material change, except as to course, tending to support Clark's testimony. Track No. 2 in this exhibit turns at a sharper angle than in Plaintiff's Exhibit A. Line No. 3 has characteristics which associate it with a wheel, not moving, upon which the tire was completely deflated and only the rim touching the road.

One witness says that mark No. 1 could have been caused by the emergency brake. It seems unusual that the mark of but one tire appears, if caused by a brake. It is, however, significant that both J. B. Newsome and Sheriff Baughn say that shortly after the accident there were two wheel tracks plainly visible from the beginning of the marks of the Tytus car, up to the middle of the road. If this testimony be true it lends support to the theory that this and the other mark may have been caused by a dragging brake.

The conclusion of the majority is that

mark No. 1 was made by the Tytus car in the first collision after being struck while over on the extreme right side of the road. The Tytus car completely out of control with a broken steering wheel and an immovable left rear wheel, would not in probability have moved 134 to 175 feet before stopping, but if it could so move the track indicates that it was made by the tire of a car under control. The irregular jagged line No. 3 was probably made by the immovable, damaged, useless left rear wheel and represents the course of the car after impact. It was not incumbent upon the plaintiff to establish what caused mark No. 1, provided the collision occurred on the left side of the road.

The majority opinion does not convincingly account for mark No. 1 and it cannot be satisfactorily explained upon the theory of two collisions, nor upon the theory of a collision at the point of its beginning on the extreme right side of the road. The trial judge was well within his province in concluding that the claim of Mr. Tytus that the collision occurred well over on the right side of the road was not supported from the physical facts, nor from the photos. In saying this I have no purpose to impugn the good faith of Mr. Tytus' testimony. It is very easy to be mistaken as to facts incident to a nerve-racking experience such as was suffered by the occupants of the cars involved.

Granted that there was but one collision, inasmuch as it is in accord with the testimony of both witnesses to the accident, it could have occurred at the north or south end of track No. 1, or at about the end of track No. 2. It is beyond contradiction that tracks Nos. 2 and 3, if made by the left rear wheel of the Tytus car, place it over on the left side of the road. Some of the Tytus car may have been over on the left side of the road had the collision occurred when its rear left wheel was at the junction of tracks Nos. 1 and 2, at or near the center of the highway.

The conclusion of the majority that the Clark car struck the Tytus car on the right side of the road and pulled it over on the wrong side is reached by their interpretation of track No. 2 on the photo and from no other fact to be found in this record and disregards the physical facts, all of which indicate an impact against the Tytus car.

It is testified that there was a puddle of gasoline near the end of track No. 2. From one photo this may have been somewhat further south, in track No. 3. The pool was,

according to some of the testimony, as much as 4½ feet over the center of the road to the left and from this point a gasoline trail could be followed up to the Tytus car to the edge of the road, near where it came to rest in the ditch.

The gasoline tank on the Tytus car had a hole in its left rear corner 3-16 of an inch wide and from 6 to 12 inches long. The majority is in doubt if gasoline would come out of this hole quickly, because its exact location is not fixed, but overlooked the witness George Collins, who described it and said that it would let all the gasoline out rapidly. The trial judge was well within his province in finding not only that the gasoline would come out from the hole, but also that it would and did gush into the road almost immediately upon the collision. It is significant that in the photo, Defendant's Exhibit 2, there is no connection between the end of line No. 2 and the beginning of line No. 3, and for a distance between them, probably several feet, there is no visible track. This may have been caused by the lifting, temporarily, of the left rear wheel of the Tytus car by the impact of the Clark car. If so, from the photo clearly the east end of track No. 2 was the point of collision and considerable strength is lent to this conclusion by the position of the gasoline as appearing in Plaintiff's Exhibit A. The gasoline, according to a photo, begins at or near the end of track No. 3. In this situation the gasoline did not appear on the road for almost 30 feet after the impact of the cars.

The witness M. C. Smith testified that two skid-marks found in 10 or 12 places, always on the left, probably made by the Clark car, came up to the place where the gasoline was found in a puddle on the road. This statement lends as much support to the conclusion of the trial court that the collision occurred on the left side of the road as any other evidence found in the record. If true, and the court had the right to believe, it, it incontrovertibly fixes the impact of the cars at the place where court placed it.

The movement of the cars from the place where the pool of gasoline was found was probably as found by the trial court. Clark was turning his car very sharply to left. After the impact the Tytus car turned very sharply to its right traveling a short distance and into the ditch and the Clark car to its left and into the ditch. The testimony of Roy Hinshaw is confirmatory of the theory of a collision followed by immediate movement

from the road, and contra that the Tytus car moved 130 feet or more after collision. He says that he was within a few hundred feet of the place where the cars came together, saw the oncoming headlights, and that they suddenly dashed to the side of the road.

There is but one bit of evidenie in this record which is at all difficult to reconcile with the conclusion of the trial court and that is mark No. 2 on the photo, Defendant's Exhibit 2. Every other physical indication and the spoken word may clearly be resolved in favor of the plaintiff's case. The majority accepts this photo as correctly presenting the marks on the road at the time of the accident and is willing to fix the place of collision by reason of its interpretation and time and again reinforces its position by the statement of M. C. Smith that it sets forth a true representation of the marks as he saw them. Mr. Smith said that all the photos were correct and undoubtedly they are, but the difference in the appearance of line No. 2 in Defendant's Exhibit 2 and in Plaintiff's Exhibit A is so apparent that Mr. Smith's testimony cannot change the fact.

Of course, none of the exhibits are trick photographs. However, the position of the camera, the condition of light and perspective affect a completed picture.

I have attempted to demonstrate that upon the photo alone Defendant's Exhibit 2, the plaintiff's case does not fail. It is obvious that minds may differ on its interpretation. A consideration of mark No. 2 on the photo in the light of the other photos and especially upon the other facts in the record does not in my judgment require or compel a different finding. I hesitate to cast aside the judgment of the trial court based upon testimony and supported by three of the photos in evidence and rely upon an inexpert interpretation of one track on one photo.

Since **Werner v Rowley, 129 Oh St 15,** the effect in this court of a reversal of a judgment on the weight of the evidence where a succeeding trial will develop the same facts as the first, is to foreclose the successful party in the trial court from again securing a judgment which will stand. This pronouncement of the Supreme Court in the cited case enjoins upon reviewing courts strict observance of the limitations upon their right of reversal.

The judgment of the trial court will be affirmed.

## ON APPLICATION FOR REHEARING

Decided May 1, 1936

By THE COURT

Submitted on application for rehearing. Counsel urge seven grounds in support of this application. We shall direct our attention to each of them as they are set forth in the supplemental application.

1. The verdict was excessive and appears to have been influenced by passion and prejudice.

The court is of the unanimous opinion that the verdict is not excessive. Plaintiff was a minor. His injuries have crippled and maimed him for life. His expectancy of life has been shortened. Damages to which he may be rightfully entitled, if the defendant was negligent, should not be reduced solely because two members of the court are of opinion that defendant was not negligent. The injuries are present and the defendant should respond in damages if his negligence was the direct and proximate cause of the injuries.

2. The evidence clearly established that even under the assumption that the defendant was to the left of the center of the road his negligence, if any, in that respect was not the proximate cause of the accident.

Whether or not negligence was the direct and proximate cause of an injury is a question to be determined by the jury—in this case the court. The entire court is of the opinion that, assuming the defendant to have been negligent, by driving on the left side of the highway, the trial court could conclude and determine from the evidence that such negligence was the direct and proximate cause of plaintiff's injuries and damages. Under this specification, defendant argues that Norman Clark, driver of the car in which plaintiff was a passenger, had the last clear chance to avoid the accident. The whole court is of opinion that the last clear chance doctrine is not applicable in this case.

3. Since the jury did not pass upon the facts, the constitutional provision should not be permitted to defeat the conclusion arrived at by two of the three judges of the Court of Appeals.

**534**

The constitutional provision prevails when a jury case is submitted either to the jury or to the court with the ██ jury waived. There are no exceptions. While there may be sound logic in this contention, the court cannot correct the provision nor avoid the results which may be reached in a case submitted as was this.

4. The dissenting opinion of Judge Hornbeck cannot be supported.

The author of that opinion supports the same and adheres to his original dissent. While the remaining two members of the court do not so agree, that fact alone is of no aid, as a unanimous decision is necessary to reverse on the weight of the evidence.

5. The court below was in error in finding that defendant drove to the left of the center of the road and in so doing was guilty of negligence per se.

The trial court was within its province in finding that defendant drove to the left of the center of the road, although the majority of the court is of opinion that such a finding was against the weight of the evidence. The court need not have found that in so doing defendant was guilty of negligence per se. The court was required to determine whether or not such operation of the defendant's car constituted negligence and whether or not such negligence was the direct and proximate cause of the plaintiff's injuries. The verdict returned and the judgment rendered is proof that the trial court found present the latter two elements. This claim falls within our comments made under Specification 2, supra.

6. The court failed to make special findings as requested by the defendant.

This claim was not argued in the briefs or orally. Under §12248 GC this court may disregard errors not argued. However, as stated in the original majority opinion of the court, all errors not argued were considered and no prejudice to defendant was found. The record discloses and we find that the trial court made special findings of fact as requested by defendant. No error could intervene to the prejudice of the defendant when, as a matter of fact, the trial court complied with his request in this particular.

7. There was a fatal variance between the plaintiff's pleadings and his proof.

The entire court is of opinion that the defendant was fairly apprised of the claims of plaintiff by the petition as filed and that there was no variance between the pleadings and proof.

The respective members of the court adhere to their former opinion. The application for rehearing is, therefore, denied. Exceptions.

BARNES, PJ, HORNBECK and BODEY, JJ, concur.